# United States District Court
## Northern District of Indiana
## Hammond Division

THE BRAUN CORPORATION,

      Plaintiff,

    v.

VANTAGE MOBILITY INTERNATIONAL, LLC,

      Defendant.

Civil Case No.: 2:06-CV-50 JVB

## OPINION AND ORDER

### A.    Background

On February 10, 2006, The Braun Corporation sued Vantage Mobility International, LLC, ("VMI") and American Honda Motors Co., Inc., for patent infringement of Braun's Patent 6,825,628 ('628 Patent). On June 15, 2006, Braun amended its complaint. Braun claimed that VMI is infringing on its '628 Patent by selling an electronic control system for vehicular wheelchair access through dealers located in this judicial district and throughout the United States. Braun claimed that Honda infringed on its '628 Patent by contributing to VMI's selling the vehicular wheelchair access systems.

On June 25, 2007, at the parties' request, Judge Rudy Lozano dismissed Honda from this case without prejudice. On July 27, 2007, this case was assigned to this Court.

On June 28, 2007, Braun and VMI began submitting their briefs on the issue of claims construction of the '628 Patent. In addition, on October 5, 2007, Braun moved to strike the declaration of David M. Auslander who is an expert retained by VMI. On July 28, 2008, the

Court heard the parties' oral arguments and allowed them to submit additional briefs. All issues having been briefed, the Court now issues its opinion on the claims construction of the '628 Patent.

**B.      Background of the Invention**

Braun develops technologies that help persons in wheelchairs to get in and out of automobiles. One of Braun's inventions, catalogued as the '628 Patent, is the subject of this lawsuit. Among other things, the '628 Patent integrates Braun's retractable power ramp system and the minivan's power sliding door system ('628 Patent at col. 2:38–50.) This integration allows for a single-touch operation of the door and ramp and "coordinates and synchronizes ramp deployment and stowing operations" with the standard power door. (*Id*.)

Early automobile wheelchair access systems were not integrated with any of the car's standard controls or components. (*Id*. at col. 1:41–43). Converters like Braun and VMI generally installed their own power ramps along with their own power door systems for opening and closing the sliding door. Among other disadvantages, the lack of integration between the converter-installed components and original equipment manufacturer's ("OEM") components meant that two separate remote-control keyfobs were required: one for operating the OEM door locks, and another for operating the converter-installed power door and ramp systems. (*Id*. at col. 1:50–61). To overcome this disadvantage, the inventors of the '628 patent sought to develop a new vehicle access control system that could make full use of the OEM door control and electronics systems. (*Id*. at col. 2:38–50).

To achieve this objective, the inventors of the '628 patent developed a control system

capable of communicating over the car's built-in electronic network, commonly referred to as a "bus." Multiple car components are connected to the bus for communications with one another. (*Id.* at Fig. 26). By communicating over the bus, the patented car access control system is able to, among other things, send and receive operation commands for opening and closing the OEM power sliding door. For example, whenever the ramp is not stowed, the control system suspends operation of the OEM power sliding door system to prevent closing the door on a deployed ramp. (*Id.* at col. 21:24–29) The system intercepts, interprets, and sends commands and status signals that are carried on the bus.

Figure 26 illustrates an embodiment of the invention. The patented vehicle access control system includes Controller 408. As part of the conversion process, Controller 408 is connected to a "communication pathway 2304" ("OEM Bus"). (*Id.* at col. 14:8–9.) The OEM Bus allows certain vehicle systems to communicate with one another. Like the OEM components and systems, the Braun Controller 408 also sends and receives commands and status information on the OEM Bus to control and synchronize operation of the OEM Door Control System 2302 and Ramp Motor 418, which deploys and stows the ramp. (*Id.* at col. 16:39–45).

To prevent the OEM Door Control System 2302 from closing when the ramp is deployed, Controller 408 interfaces with the OEM system by way of a wake-up communication pathway 2306. (*Id.* at col. 14:43-51). In some OEM vehicles, the wake-up pathway 2306 runs directly from the standard control module 406 to the Door Control System 2302. During the conversion process, the wake-up pathway 2306 is re-routed through the Controller 408 so that the Controller 408 has exclusive control over whether the Door Control System 2302 is in a "wake mode" or a "sleep mode." (*Id.*). In the wake mode, the Door Control System 2302 is fully responsive to door

commands on the OEM Bus; in the sleep mode, however, it is not responsive to such commands. (*Id*. at col. 15:2-6; 40–43). When the ramp is not stowed, the Controller 408 puts the Door Control System 2302 into sleep mode. (*Id*. at col.15:12–21). While in sleep mode, the door will not close, even though a "close door" command may be sent over the OEM Bus by another component. (*Id*. at col. 14:43–57). When the ramp is stowed, the Controller 408 sends a wake-up signal on the wake-up pathway 2306 to place the Door Control System 2302 in the fully operational wake mode. (*Id*. at col. 15:44–53). The Controller 408 then sends its own "close door" command over the OEM BUS. (*Id*. at col. 15:5 56). The now-awakened Door Control System 2302 detects and responds to this "close door" command and closes the door. (*Id*.).

## C.    Applicable Law

"[C]onstruction of claims is simply a way of elaborating the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims." *Scripps Clinic & Res. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991). Claim construction is a matter of law for this Court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The process of claim construction begins with the words of the claim because "[i]t is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.

Cir. 2005) (internal quotation omitted). Generally, "all terms in a patent claim are to be given their plain, ordinary and accustomed meaning to one of ordinary skill in the relevant art." *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001). "[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

The claims, however, do not stand alone. For that reason, claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315. Indeed, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id*. But, "limitations appearing in the specification will not be read into [the] claims and . . . interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989).

The final piece of intrinsic evidence to be considered is the patent's prosecution history, which "consists of the complete record of proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id*.

"Along with the intrinsic evidence of record . . . extrinsic evidence can be useful in claim construction and technical dictionaries may provide [help] to a court" to better understand "the

way in which one of skill in the art might use the claim terms." *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005). Extrinsic evidence, however, may not be used to "contradict any definition found in or ascertained by a reading of the patent documents." *Phillips*, 415 F.3d at 1322–23.

"Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Philips*, 415 F.3d at 1316.

**D.      Claims Construction**

To aid the Court's interpretation of the '628 Patent, among other things, VMI submitted a declaration from one of its experts, David M. Auslander. Braun moved to strike this declaration as improper. The Court does not need to decide the merits of Braun's motion as it is able to construe the '628 Patent claims without reference to Mr. Auslander's declaration. Accordingly, the Court denies the motion without prejudice.

**E.      Claims Construction**

The '628 Patent contains 23 claims: 5 independent claims and 18 dependent claims. Braun asserts infringement of 19 claims (excluding 5 dependent claims: Nos. 4–7 and 19). Claims 17 and 18 are identical to claims 12 and 15. Therefore, a total of 15 claims are asserted against VMI: claims 1–3, 8–10, and 21–22 are directed to a wheelchair access system for a

vehicle with a door and a wheelchair ramp; claims 11–18, 20, and 23 are directed to a method of providing wheelchair access to a vehicle having a door and a ramp.

**(1)** *Door Operation Commands*

Independent claims 1 and 11 and their dependent claims use the term "door operation commands." The parties propose the following meanings to this term:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| Instructions in the form of coded data that cause a door function, such as lock, unlock, open, or close, to occur. | Door control system specific signals sent to the controller that controls door functions, such as, open, close, lock/unlock. |

The principal disagreement between the parties is over the word "commands." Citing to Webopedia Computer Dictionary, Braun insists that "[a] 'command' is 'an instruction to a computer or device to perform a specific task.' An 'instruction' is defined as 'a code that tells a computer to perform a particular operation.'" From this Braun concludes that "[w]hen these definitions are combined 'door operation commands' means ' instructions in the form of coded data that cause a door function, such as lock, unlock, open, or close, to occur.'" (Braun Claim Constr. Br. at 7.) Moreover, Braun points out that the embodiment in Figure 26 illustrates that "door operation commands" are sent and received in coded data. Finally, Braun relies on prosecution history to claim that "door operation commands" are instructions in the form of coded data.

VMI argues that "door operation commands" are not limited to coded data and that Braun's definition is too narrow. VMI refers to the specification illustrating Chrysler Town &

7

Country minivan and points out that its Body Builder's Guide Manual shows lock and unlock commands as electric door operations commands, not coded commands. In addition, VMI argues that, since Figure 26 is a later added embodiment, "door operation commands" cannot be limited to just binary signals. Finally, VMI insists that the examiner of the '628 Patent gave no reason to believe that the current invention was distinguished from prior art by the insertion of "door operation commands" to mean coded data.

The Court finds that Braun's proposed definition is too narrow; rather, "door operation commands" are not limited to coded data instructions but include other manners of instruction as generally known to those skilled in the art. Braun relies on that portion of the specification that explains that a "door command" is "a serial data signal in binary form" that controls the operation of door features such as opening and closing. (The '628 Patent cols. 4:57–5:4; 5:11–15.) However, the very next sentence of the specification states that "[i]t is contemplated that receiver can communicate with control module in other manners as generally known by those skilled in the art." (*Id.* at col. 5:14–16.) This sentence refers specifically to the transmission of door commands from the receiver to the control module, which the previous sentence described as communicating in binary form. Thus, by inserting it immediately after the description of the coded signals, the inventors sought to avoid the narrow interpretation that door commands are only coded data signals.

Similarly, while Figure 26 refers to a bidirectional serial bus on which the commands would be coded, this embodiment does not exclude other forms of commands, and the independent claims are not limited to a serial bus.

Braun's reliance on Webopedia Computer Dictionary is not convincing. Braun derives

the definition from an "online encyclopedia dedicated to computer technology," (*see* Ex. 3 at 1.), thus presuming that the word "command" is an exclusively computer related word. Moreover, Webopedia's definition of the word contemplates computer and internet technology applications not car or wheelchair access mechanism parts, albeit containing computer parts.

Finally, Braun's reference to the prosecution history does not establish that the examiner narrowly interpreted "door operation commands" as coded data. Braun argues that claims 1–10 were immediately allowed as they included the claim limitation "door operation commands," but claims 11–16 were initially rejected as not including the term and that after adding "door operation commands" they were allowed. Yet, claim 1 also included the term "selectively delay execution" of the door operation commands, which claim 11-16 did not include. Braun added the term "selectively delay execution" of the door operation commands to all of the rejected claims and a Notice of Allowance followed. Therefore, there is no absolute basis to hold that the examiner allowed the claims because he narrowly read door operation commands to include only coded data operation commands. The prosecution history is not convincing enough to override the language of the claims that is broader in scope than Braun's proposed interpretation. Therefore, the Court adopts VMI's proposed construction: "door operation commands" are door control system specific signals sent to the controller that controls door functions, such as, open, close, lock and unlock.

## (2) *Communication Pathway*

Independent claims 1 and 11 include the term "communication pathway. The parties propose the following meanings to this term:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| A medium that carries coded data, such as commands and status information, between components. | A medium that carries a communication signal between components. |

Braun argues that "[t]he claim language establishes that one role of the 'communication pathway' is to carry 'door operation commands' sent by the 'standard control module' to other components of the system. (Braun Claim Constr. Br. at 10). From this, Braun concludes that "the 'communication pathway' must be capable of carrying coded data," (*id.*) and that "a medium incapable of carrying 'coded data' cannot be a 'communication pathway, (*id.* at 11).

VMI insists that nothing in the specification defines a "communication pathway" to include only "coded data." VMI maintains that "if Braun had intended to limit the claim to only those communication pathways that carry 'coded data' it would have used the term 'serial bus' instead of the broader term 'communication pathway.'" (VMI Resp. at 5.)

Braun's argument is plausible only if the term "door operation commands" means coded data commands. But, as explained above, the term cannot be so narrowly construed. There is no other strong basis in Braun's argument to conclude that a "communication pathway" is a medium that carries coded data between components. In fact the opposite is true. For example, the portion of the specification referring to the embodiment of a communication pathway in Figure 4 states that "[i]n one embodiment, the components of system 400 are operatively coupled together with electric conductive wires for communication by electrical signals." (The '628 Patent col. 5:39.) Accordingly, the Court adopts VMI's definition of "communication pathway": a medium that carries a communication signal between components.

**(3)** *Operatively Coupled to Said Communication Pathway*

Independent claim1 includes the limitation "operatively coupled to said communication pathway." The parties propose the following meanings to this term:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| Connected to the communication pathway to send and/or receive coded data on the communication pathway. | Connected to the communication pathway to send and receive signals on the communication pathway. |

The parties arguments are similar to the ones regarding the meaning of the "communication pathway." Again, insofar as Braun insists that "door operation commands" are limited to only coded data signals, its reliance on that term for interpretation of other terms is wrong. The Court adopts VMI's proposed construction: "operatively coupled to said communication pathway" means connected to the communication pathway to send and receive signals on the communication pathway.

**(4)** *Controller*

Independent claims 1 and 21 include the term "controller." The parties propose the following meanings to this term:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| An electronic device that actuates and/or directs the operation of other components, including being operable to selectively delay execution of the door operation commands. | A device capable of making decisions with respect to the operation or actuation of a physical system such that the physical system behaves in a desired way. |

Because the specification describes a function of the controller as "intercept[ing] communications with an OEM control module . . . [and] coordinat[ing] ramp deployment and stowing operations with the OEM control module," Braun argues that "controller" is a device that actuates and directs the operation of other components within the system. Braun insists that "controller" is not a "relay based control system." (Braun Constr. Br. at 14.)

VMI, on the other hand, maintains that nothing in the specification excludes a relay logic controller as a type of "controller." VMI submits that "[i]f a device detects, intercepts, or relays signals to control and synchronize the operation of the ramp, door or kneeling motors with the rest of the vehicle to prevent accidental or operational interference between the vehicle components it would be understood by one skilled in the art reading the '628 patent to be a 'controller.'" (VMI Resp. at 8.)

The specification gives examples of "controller": "[c]ontroller can be a programmable logic control system (PLC), a microprocessor, or other type of electronic controller as known by those skilled in the art. Controller can be composed of one or more components of a digital and/or analog type. Controller can be programable by software and/or firmware, a hardwired state-machine or a combination of these. In one form, controller is based on a Motorola 68C705P6 microprocessor that includes four A/D (analog-to-digital) converter channels." ('658 Patent col. 5:44–50.) These examples do not exclude a relay based control system. To the contrary, insofar as PLC closely relates to a relay logic controller (*see* DE 87-3 Ladder Logic), the specification contemplates a relay. And again, since the Court does not construe "communication pathway" to mean a medium able to carry only coded data, Braun's argument that relays are not part of the invention as they cannot be connected to "communication

pathway" carrying only coded data is unconvincing. In summary, the Court construes

"controller" as a device that actuates and/or directs the operation of other components, or is

capable of making decisions with respect to the operation or actuation of those components,

including being operable to selectively delay execution of the door operation commands.


**(5)**     ***Standard Control Module***

Independent claim1 includes the term "standard control module." The parties propose

the following meanings to this term:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| A controller that controls features or components installed by the OEM. | Indefinite, limited to body control module (CBM); or simply another controller. |

Braun's and VMI's interpretations of "standard control module" concentrate on two

different things. Braun defines "standard control module" by what it controls, that is, features or

components installed by the OEM, whereas VMI defines the same instrument by what it is,

namely, a mere controller or a body control module ("CBM"). In a word, neither definition

excludes the other.

Therefore, the Court adopts Braun's definition: "standard control module" is a controller

that controls features or components installed by the OEM. Neither the claims nor the

specification limit the "standard control module" to just body control module, as suggested by

VMI. At the same time, the specification recognizes that a "standard control module" need not

be a device installed by the OEM (*see* '628 Patent col. 4:64–65 ("Standard control module is

*typically* an OEM installed component." (emphasis added); *see also id.* at col. 5:5–8 (" . . .

13

standard control module [is] standard component[] supplied by a manufacturer of vehicle *or installed by the vehicle owner or a third party*." (emphasis added)); it only controls OEM equipment.

**(6)** ***Selectively Delay Execution of Said Door Operation Commands***

The '628 Patent includes the term "selectively delay execution of said door operation commands." The parties propose the following meanings to the words "selectively delay":

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| Delaying the execution of door operation commands when movement of the door would cause operational interference between the door and the ramp. | Indefinite. No definition in the specification. Only embodiment disclosed is intercept/transmit/echo. |

Braun submits that terms "selectively," "delay," and "execution" have common and ordinary meanings that, when combined, make clear that "whenever the ramp is moving or might otherwise be in the path of a closing door . . . the door control system is prevented from executing door operation commands." (Braun Claims Constr. Br. at 17.)

VMI objects to such an interpretation as overly broad. It argues that "[o]ne skilled in the art would be uncertain as to whether his wheelchair accessible vehicle infringes the patent claims or not as it is absolutely necessary for <u>all</u> wheelchair accessible vehicles to prevent door operation when the ramp is deployed. There is no other way to operate the vehicle. Thus, if the term were defined broadly, the method claims, claim 23 for example, would encompass all methods of preventing operational interference between the door and the ramp." (VMI Resp. at 12–13.) Consequently, VMI submits that the language must be interpreted narrowly to mean

"intercept/transmit/echo method of delaying execution of door operation commands" as outlined in Cols. 15: 36–40, 50–55; 18: 23–25, 40–42, 59–63; 19:17–20. (*Id.* at 13.)

The Court adopts Braun's interpretation: "selectively delay execution of the said door operation commands" means delaying the execution of door operation commands when movement of the door would cause operational interference between the door and the ramp. This meaning is consistent with the language of the claims themselves which recite that the controller "selectively delay[s] execution of said door operation commands by said door control system while operating said ramp motor to move the ramp" (Claims 1 and 21) and that execution of the door operation commands is selectively delayed "in order to prevent operational interference between the door and the ramp" (Claims 11 and 23).

In challenging the claims as indefinite VMI bears the burden of showing the invalidity of the patent. Its current briefs fail that burden, and the Court is not convinced that the term must be limited to the narrow interpretation of "intercept/transmit/echo method of delaying execution of door operation commands." Claims are indefinite when they are "not amenable to construction or are insolubly ambiguous." *Young v. Lumenis, Inc.*, 492 F.3d 136, 1346 (Fed. Cir. 2007). That is not the case here.

**(7)** ***Suspending Operation of the Door Operation Commands of a Door Control System***

The '628 Patent includes the term "suspending operation of the door operation commands of a door control system." The parties propose the following meanings to the words "suspending operation":

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| Rendering the door control system temporarily unresponsive to door operation commands. | Indefinite, as is "selective delay." The only embodiment disclosed is intercept/transmit/echo. |

As with the previous term, VMI fails its burden to establish indefiniteness. Moreover, VMI's proposed definition construes "selectively delay execution" and "suspending operation" to mean the same thing. Such an interpretation is contrary to claim construction rules as it would render another claim superfluous. *See Comark Communications, Inc. v. Harris Corp.*, 156 F3d 1182, 1187 (Fed Cir. 1998) (finding a violation of the doctrine of claim differentiation when a proposed construction would render another claim superfluous). For example, claims 11 and 23 recite: "suspending operation of the door operation commands of a door control system to selectively delay execution of the door operation commands." If the Court were to accept VMI's proposed construction, the inclusion of both terms within the same claim would be redundant. Accordingly, the Court accepts Braun proposed construction: "suspending operation" means rendering the door control system temporarily unresponsive to door operation commands.

**(8)** ***Wake Mode, Wake Signal, Sleep Mode, and Sleep Signal***

The '628 Patent includes the terms "wake mode," "wake signal," sleep mode," and "sleep signal." The parties propose the following meanings for these terms:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| | |

| | |
|---|---|
| Wake mode—when a component is fully responsive to commands or signals directed to the component. | Wake mode—an active energized state. |
| Wake signal—a signal that places the component in wake mode. | Wake signal—a control signal sent to a component that is in sleep mode in order to place the component in an active energized state. |
| Sleep mode—when a component is not fully responsive to commands or signals directed to the component. | Sleep mode—the mode in which a component is in a de-energized state to conserve energy. |
| Sleep signal—a signal that places the component in sleep mode. | Sleep Signal—a signal that places a component in a de-energized state to conserve energy. |

The dispute between Braun and VMI over the meaning of the "wake" and "sleep" terms is over a single issue: whether the claims require that the door control system in sleep mode be unresponsive to all commands. Braun's position is that they do not; VMI insists otherwise. VMI relies on the United States Patent No. 6,075,460 issued to Chrysler Corporation on June 13, 2000. That patent refers to the "wake" and "sleep" mode as a de-energized state to conserve energy during which all functions of the component are suspended.

The Court adopts Braun's proposed meanings for the "wake" and "sleep" terms. Claim 12 recites "[t]he method of claim 11, wherein said suspending operation of the door control system includes placing the door control system into a sleep mode, wherein the door control system is unresponsive to commands when in the sleep mode." Claim 11, as well as the core of the '628 Patent, is concerned with integrating the movement of the power ramp system and the minivan's power sliding door system:

A method of providing wheelchair access to a vehicle having a door and a ramp, comprising

. . .
>suspending operation of the door operation commands of a door control system to
>>selectively delay execution of the door operation commands operable to
>>control movement of the door of the vehicle in order to prevent
>>operational interference between the door and the ramp; and
>moving the ramp of the vehicle by operating a ramp motor coupled to the ramp
>>after said suspending operation of the door control system.

(The '628 Patent col. 21:20–32.) Therefore, the natural construction of the "wake" and "sleep"

terms must relate to the movement of the door rather than all of its functions.

**(9)**   ***Door Control System***

The '628 Patent includes the term "door control system." The parties propose the

following meanings for this term:

| Braun's Proposed Construction | VMI's Proposed Construction |
|---|---|
| An electronic system for controlling movement of a vehicle door. | A combination of a door, a door motor, a driver, a controller to control the door motor and a communication pathway used together to operate the vehicle door. |

Braun claims that its proposed definition is based on the ordinary and customary meaning

of the words "door control system." It gives no further justification for its position. VMI submits

that a door control system without a door, a door motor, a driver, a controller to control the door,

and a communication pathway is not a door control system; all these parts are necessary.

VMI's proposed construction does not comport to the language of claim 1. This claim

recites an invention comprising, among other things, a controller coupled to a communication

pathway and a door control system. According to claim 1, door control system is separate from

the controller and communication pathway. Moreover, since "door control system" controls the

operation of the door while the ramp is being operated, door control system is separate from a door; it is a system that affects the door. However, it is consistent with the language of the claims to construe "door control system" to include a door motor and a driver. Hence, the Court finds that "door control system" is an electronic system, that also includes a door motor and a driver, for controlling movement of a vehicle door.

**(10)** *Bidirectional Serial Bus*

The '628 Patent includes the term "bidirectional serial bus." The parties agree that "bidirectional serial bus" is a medium that carries coded data, such as commands and status information, between components in either direction, and the Court accepts this definition.

**(11)** *Power Communication Pathway*

The '628 Patent includes the term "power communication pathway." VMI argues that this term is indefinite to the one skilled in the art, as the specification does not define what a "power communication pathway" is and does not provide any examples of a power communication pathway. Nevertheless, VMI submits that "power communication pathway" could be construed as "specific and discrete communication pathway between the standard control module and door controls system used solely for sending the wake signal and sleep signal." (VMI Constr. Br. at 8.) Braun suggests, without much analysis, that power communication pathway means "a pathway that carries a wake signal that places the door control system into a responsive wake mode." (Braun Resp. at 16.)

The specification, although vague, does not limit "power communication pathway" to

carrying just a wake signal. Rather, it speaks also of conducting the sleep signal as well. (*See* '628 Patent cols. 15:30; 16:32; 18:1–2). However, the specification does not assign any other purpose to "communication pathway." Therefore, the Court adopts VMI's suggested construction: communication pathway means specific and discrete pathway between the standard control module and door controls system used solely for sending the wake signal and sleep signal.

**F.    Conclusion**

For the reasons stated above, the Court denies without prejudice Braun's Motion to Strike the Declaration of David M. Auslander (DE 100).

Having construed the disputed claims of the '628 Patent, the Court will set this case for a status/scheduling conference. The courtroom deputy will contact the parties to arrange the time for the conference.

SO ORDERED on March 26, 2009.


 s/Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE